UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA, *ex. rel.*
ROBERT BAKER,

    Plaintiff/Realtor                                                 Case No. 00-74410

v.                                                                             Hon. John Corbett O'Meara

REHABILITATION SPECIALISTS OF
LIVINGSTON COUNTY, INC., a Michigan
corporation d/b/a/ REHABILITATION SPECIALISTS
OF SOUTH MACOMB; REHABILITATION
SPECIALISTS OF CLINTON TOWNSHIP;
REHABILITATION SPECIALISTS OF MACOMB
COUNTY; BRADLEY PUTVIN, and VICKEY
DeYOUNG, jointly and severally,

    Defendants.
_____/

## OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Before the court is Plaintiff's motion for partial summary judgment. The motion was filed April 4, 2008 and has been fully briefed. For the reasons stated below, this court denies the motion.

## FACTUAL BACKGROUND

Rehabilitation Specialists of Livingston County (RSLC) is a corporation owned by Defendant Bradley Putvin, a physical therapist by trade and education. As the name implies, it provides rehabilitation services, including speech, physical, and occupational therapy. Putvin also owned Michigan Allied Health Professionals (MAHP) which allegedly provided staffing to RSLC. Around 1987, Putvin hired Mark Miller to serve as CFO of MAHP and controller of Putvin's other companies, including RSLC.[1] The relationship lasted until March 1999 when

---

[1] Putvin and his wife managed these businesses on their own until around 1987 when Putvin's wife was diagnosed with terminal cancer. In order to care for his wife, Putvin turned over complete control of the finances to Miller. In February 1993, the wife succumbed to cancer, leaving Putvin with three children ranging in age from four to thirteen. He continued to allow Miller to control the finances of the company, this time so Putvin could raise his children.

Putvin fired Miller for insubordination. Subsequently, it was learned that Miller used his position to embezzle from Putvin's companies. As a result, RSLC is a shell of what it once was and Putvin's personal finances are apparently ruined.

The dispute stems over Medicare payments. A large part of the RSLC's success came from its ability to bill Medicare for the costs of its services. However, Putvin had little, if any, knowledge of the procedures involved in making these billings, and instead relied on Miller for this task. In order to keep track of these payments, corporations such as RSLC issue yearly cost reports. Later the reports are subject to an audit. In this instance, the government claims RSLC's cost reports for 1997 and 1998 violated the False Claims Act. Most of the blame for these violations lies in Miller's criminal actions; however, the government argues that RSLC and Putvin are also to blame because they gave Miller unsupervised authority, so much so that it equates to knowledge and tacit acceptance of Miller's actions.

It is alleged that RSLC contracted with Autumn Woods Nursing Home to provide therapy services to its patients. The terms of the contract called for RSLC to bill third-party payors, including Medicare, for their services. Notwithstanding these terms, Autumn Woods billed the patients or their third party payors for occupational therapy, from May 1, 1997 through August 1, 1997, totaling $306,361. From August 1, 1998 through December 31, 1998 Autumn Hills billed its patients or their third-party payors for all of RSLC's services, totaling $743,979.14. Another Putvin-owned company, In Home Therapy (IHT), IHT took patient referrals for in-home therapy services in 1997 and 1998, and arranged for therapists to meet patients in their homes. IHT subsequently billed the third-party source that referred the patient to them.

As controller of these companies, Miller submitted a cost report in 1997 to United Government Services (UGS)[2] which included (1) the salary and benefit costs of RSLC employees who rendered occupational therapy services at Autumn Woods between May 1997 and August 1997; and (2) salary and benefit costs of IHT employees during 1997. However, it appears that Miller knew that the costs he submitted in this report were false in the following ways:

(1) he sought reimbursement from Medicare for services already paid for by Autumn

---

[2] UGS is the agency that analyzes and audits these cost reports.

Woods.
(2) he sought reimbursement from Medicare to IHT even though its costs had already been reimbursed by Medicare or its patients
(3) he understated the costs incurred by RSLC in treating non-Medicare patients, which resulted in over-allocation to Medicare of the company's expenses.[3]

In the fall of 1998, UGS conducted an on-site audit of the 1997 cost report. The audit sought documentation for the amount of non-Medicare charges reported on the 1997 report. Specifically, UGS asked for a list of patient names and support for RSLC's non-Medicare charges. Instead, Miller produced the files of five patients whose records were accurate but were not on the list of patients requested by the auditor. The government alleges that Miller understood this, and submitted the records of these five patients so Putvin's companies could escape $420,000 in liability. Putvin signed Miller's reports, and admits he did not read or discuss them with Miller.

Putvin claims he discovered some of Miller's deceptions in the first part of 1999, more than six months after the 1997 cost report was submitted, when he received a tax return for the Rehabilitation Specialists, Inc., a dummy corporation Miller had organized without Putvin's knowledge. Once Miller was fired, Putvin found that RSLC's financial records were in a "state of rubble," that Miller had erased most of his computer records, and that RSLC did not have any billing records. Given this state of disarray, Putvin hired Gary DeYoung and Paul Wilkie to submit RSLC's 1998 report.[4]

RSLC and Putvin claim they did the best they could with the information left behind by Miller to submit an honest report. Putvin claims he advised Wilkie of Miller's history so Wilkie could put together a conservative report that would reveal any inaccuracies. However, the fact is that they relied on what was left of Miller's accounting of RSLC's financial records, and few if any changes were made to that information. In turn, Putvin signed off on the 1998 cost report

---

[3]Miller has testified that he provided false information for 1997. In the course of his fraud and embezzlement, Miller admitted to taking the excess profits for himself through a dummy corporation called Rehabilitation Specialists, Inc. This corporation was apparently established without Putvin's knowledge or approval.

[4]Gary DeYoung was an accountant with the firm of Wakechild and Wakechild, and was brought in as an accountant for RSLC. He was responsible for assembling RSLC's financial information in the wake of Miller's firing. Paul Wilkie was a C.P.A. with the firm of Wilkie and Miller, and was brought in to assemble the 1998 Cost Report.

without reviewing the report or discussing it with Wilkie.

## LAW AND ANALYSIS

### A. Standards of Review

Summary judgment is proper if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if proof of that fact would establish or refute one of the essential elements of a claim or defense and would affect the application of governing law to the rights and obligations of the parties. Kendall v. Hoover Co., 751 F.2d 171, 174 (6th Cir. 1984). The court must view the evidence and any inferences drawn therefrom in a light most favorable to the nonmovant. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). For a claim to survive summary judgment, the nonmovant must offer more than a mere scintilla of evidence as to the material facts. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). The movant's burden is satisfied where there is an absence of evidence to support the nonmovant's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

### B. Elements of Fair Claims Act Violation

The government alleges violations of the Fair Claims Act, see 31 U.S.C. 3729 ("[A]ny person who knowingly presents, or causes to be presented to an officer or employee of the United States Government a false or fraudulent claim for payment or approval" is liable for civil penalties and treble damages). To prevail, the government must prove that (1) the defendants presented, or caused to be presented a claim for payment or approval to the government; (2) the claim was false or fraudulent; and (3) the defendants acted knowingly. See 31 U.S.C. § 3729(a); United States ex rel. A+ Homecare, Inc. v. Medshares Management Group, 400 F.3d 428, 450-51 (6th Cir. 2005). For FCA purposes, a person acts knowingly if they have actual knowledge, or they act with deliberate ignorance or reckless disregard to the truth. Proof of specific intent is not required. See 31 U.S.C. § 3729(b).

The parties concede the first two points, that is that the Defendant presented claims to the government for reimbursement, and that they were false or fraudulent. The question here rides on whether Putvin and RSLC "acted knowingly."

### C. Did the Defendants act knowingly?

#### 1). RSLC's Liability for its 1997 Cost Report

The government moves for partial summary judgment on its claims against RSLC

through a theory of vicarious liability: since Miller was RSLC's controller and de facto Chief Financial Officer, he acted within the scope of his duties and ripped off the government when he submitted the 1997 cost report. In turn, Miller's actual knowledge of the deceit makes RSLC liable for the actions alleged in this complaint. See United States ex rel. Shackelford v. American Management Inc., 484 F.Supp.2d 669, 676 (Cohn, J.)(E.D. Mich. 2007).

This Court disagrees with the ruling made in Shackelford in this regard: an employer should not necessarily be held vicariously liable for the actions of its employees.[5] Shackelford holds that the FCA was intended to be "a more effective weapon against government fraud" and to encourage private citizen involvement in exposing this fraud. Shackelford, 484 F.Supp.2d at 677. This is true; however, Shackelford essentially employs a negligence standard that leaves employers subject to punitive damages for the criminal acts of their employees, see e.g. Vermont Agency of Natural Resources v. United States, 529 U.S. 765, 784-85 (2000), and can result in a manifest injustice against employers whose employees act criminally to not only defraud the government, but to defraud their own employer as well.

This standard runs contrary to the District of Columbia Circuit which said that a reckless disregard for the truth in a FCA claim is an extension of, or an extreme form of, gross negligence. United States v. Krizek, 111 F.3d 934, 941-42 (D.C. Cir. 1997). Although Plaintiff prefers to label RSLC's liability for Miller's actions as "actual knowledge", such knowledge would make RSLC criminally liable for Miller's actions. A better description is whether RSLC showed reckless disregard for the truth. It seems inconceivable to this court that any corporation would recklessly disregard an employee who is stealing both it and the government blind. As opposed to the facts in Shackelford, that is the case in this instance. This matter shows an employee who from all accounts used his knowledge and position of trust to take from the government and the employer. As such, the "scope of the employment" test employed by Shackelford is not only insufficient to address the facts of this case, but it is excessively punitive to corporations victimized by the criminal acts of their employees. Rather, the addition of requiring the government to prove that the actions were for the purpose of benefitting the corporation ensures that the FCA is not merely an effective weapon against government fraud,

---

[5]The court also notes and echoes Judge Cohn's statement that this is unchartered territory in Sixth Circuit law. There is no precedent regarding the vicarious liability of an employer under the FCA in this Circuit. Shackelford, 484 F.Supp.2d at 673.

but a just one as well. See e.g. Grand Union Co. v. United States., 696 F.2d 888, 891 (11th Cir. 1983); United States. v. Hill, 676 F. Supp. 1158, 1179 (N.F. Fla. 1987).

### 2). RSLC's Liability for its 1998 Cost Report

In regards to the 1998 cost report, RSLC is alleged to have acted with deliberate ignorance or reckless disregard of the truth. In this instance, the RSCL cost report was prepared by Wilkie who had to rely entirely on information provided to him by Gary DeYoung, an outside contractor who at the time was hired to help accumulate the materials necessary for filing the report. The information available was recorded and maintained by Miller whose actions at the time were not fully known. Further, RSLC hired an outside contractor with 15 years in accounting and a CPA to do the report. Both understood the impact of Miller's history. There is certainly a reasonable inference to imply concern for the truth on the part of the corporation, one that is appropriate for a jury to decide.

### 3). Putvin's Liability for the 1997 and 1998 Cost Reports

Putvin's liability rides on his knowledge of the events in question. In regards to the 1997 Cost Report, there is nothing to suggest that he had actual knowledge; his own statements tend to make one wonder whether he was deliberately indifferent to his responsibilities as owner and CEO of his companies. What Plaintiff wants is for the court to decide Putvin's state of mind when he signed off on the 1997 report. As a physical therapist who lacked a business background, his actions certainly indicate some negligence for delegating so much trust and authority to Miller, but one has to question whether they indicate a reckless disregard or deliberate indifference to the truth. The question involves a material question of fact suitable for a jury to decide.

The same holds true as to Putvin's knowledge of the fraud perpetrated in the 1998 Cost Report. The government dwells on Putvin's testimony that he delegated his responsibilities concerning Medicare cost reports to DeYoung and Wilkie, so much so that he signed the reports without reviewing them. However, the facts also imply that Putvin and RSLC had to do the best job they could in compiling the 1998 Cost Report with the limited, flawed information it had. To that end, Putvin hired trained professionals to sort out the mess of destroyed and flawed information left behind by Miller which could also imply that Putvin had regard for the truth and sought to publish a correct and honest account of his 1998 costs. In the end, the answer is one

that a jury should decide, and not this court.

## CONCLUSION

Accordingly, IT IS HEREBY ORDERED that Plaintiff's motion for partial summary judgment, filed on April 4, 2008, is DENIED.

s/John Corbett O'Meara
United States District Judge

Date: August 13, 2008

I hereby certify that a copy of the foregoing document was served upon the parties of record on this date, August 13, 2008, by electronic and/or ordinary mail.

s/William Barkholz
Case Manager